Jones, J.
We hold that in the circumstances disclosed by this record the Surrogate was warranted in concluding that there had been such a breach of their professional responsibility to the decedent as to require that the lawyers named as executors of his will be precluded from serving in that capacity.
The question is not whether the proof would be sufficient to sustain a finding of such undue influence as to warrant denying the decedent’s will admission to probate. The issue is much narrower and concededly has received almost no articulated judicial attention. Was there here such impropriety and overreaching by the father-son team of attorneys as to war *4 rant the Surrogate in denying them the right to serve as coexecutors of the decedent’s will? Notably the Surrogate saw and heard all the witnesses. In our view particular weight should be accorded the evaluation which he placed on what are largely factual matters. We defer to his appraisal of the relative credibility of the testimony of the two attorney-draftsmen with respect to transactions to which in great measure they were the only surviving witnesses.
The decedent was an elderly man, 82 years of age, with physical infirmities whose mental acuities were waning. The proof was that some three months prior to the execution of the will in question the decedent told Ernest S. Canfield, a friend of 40 years and his financial advisor for the past 25 years, that he wished to update his will and asked Canfield if he could recommend an attorney. Canfield recommended Abraham A. Katz, an attorney with whom he was socially acquainted but who had never rendered professional services to him. A week or 10 days before the will was executed the decedent’s son-in-law met Abraham Katz to drive him to the decedent’s home. To the son-in-law’s surprise, Katz, Sr., brought his son, Katz, Jr., along, as "an expert in connection with any questions which might come up during my conference with [the decedent]”. In fact Katz, Jr., had been admitted to practice for only three years. Prior to this occasion both Katz, Sr., and Katz, Jr., had been total strangers to the decedent and the members of his family.
The testimony was that this first conference with the decedent lasted from two to three hours. The decedent showed the attorneys his current will and they had been informed that he no longer wished to have his bank serve as his executor because he wanted to avoid the fee which the bank would normally expect to receive for serving in such capacity. The attorneys were also told that there had been discussion of the possible appointment of the decedent’s daughter and son-in-law because the decedent knew they would not charge a fee. The younger Katz testified that there was discussion of the appointment of an executor or executors and of the number of executors. The emphasis, however, was always on "executors” in the plural, yet, as the attorneys admitted, they never told the decedent that if there were to be two executors each would be entitled to receive full commissions because, as the attorneys knew, the estate would be over $100,000. The only reasons suggested by Katz, Jr., on trial for having more than *5 one executor was to have someone who could serve in the event of the death, incapacity or disappearance of an executor and to have a third executor who could resolve any standoff between the other two.
The new will was prepared appointing the two Katzes and Mr. Canfield as executors. Without having forwarded a copy of the proposed will for the decedent’s advance examination (and apparently without even inquiring whether the decedent wished to see the will prior to the occasion for its execution), the two attorneys returned with the typed will on July 23 and in a conference which lasted perhaps three quarters of an hour the will was executed.
We are persuaded that this record presents evidence which supports the Surrogate’s conclusion that there was overreaching by a father-son combination of attorneys who before the transaction in question had been total strangers to their client. Respondents ask us to credit their claim that this decedent independently and freely elected to impose that special confidence in these two strangers which is implicit in the designation of any executor, notwithstanding that he had never seen either before and that neither had ever rendered any professional services to him on the basis of which he might have formed an opinion as to their professional competence or personal integrity. Even though they knew that the decedent was seeking to avoid executors’ fees, these attorneys concededly never told him that if they were both appointed his executors each would receive full commissions. The reasons advanced for multiple executors were transparently hollow; provision could have been made for the possibility of a vacancy in the office of executor by the appointment of a successor fiduciary as well as by the appointment of coexecutors. No sufficient reason was made to appear for the appointment of either stranger-attorney, to say nothing of any justification for appointing both. It is not without some significance that when Mr. Canfield (who had recommended the senior Katz and then himself had been named without his knowledge as a third executor) discovered that both father and son had been named as executors, he promptly renounced.
In consequence of their engagement as the decedent’s attorneys, there unquestionably came into being a confidential relationship which imposed on the attorneys a special obligation both of full disclosure and fair dealing. These attorneys *6 failed in their obligations in these regards to such an extent that the Surrogate found them guilty of constructive fraud.
While recognizing that the provisions of the Code of Professional Responsibility are not to be elevated to the status of decisional or statutory law, nonetheless the courts should not denigrate them by indifference (cf. People v Hobson, 39 NY2d 479, 484-485; Matter of Rosenthal v Harwood, 35 NY2d 469). That code contains a precisely pertinent provision: "EC5-6. A lawyer should not consciously influence a client to name him as executor, trustee, or lawyer in an instrument. In those cases where a client wishes to name his lawyer as such, care should be taken by the lawyer to avoid even the appearance of impropriety.” In this instance the injunctions of both sentences of this admonition appear to have been violated. The Surrogate found in effect that these attorney-draftsmen were legally responsible for their own designation as coexecutors; surely it cannot be said that any care whatsoever was taken to avoid what was at the very least the appearance of impropriety.
As the learned Surrogate noted, the precise issue presented in this case is a novel one which has not been addressed in any case in our courts and appears not to have been confronted in other jurisdictions. The customarily encountered contention is that such undue influence was exercised on the decedent as to have vitiated the execution of the entire will. That is not the contention here; the issue is narrower and of a different nature. It is not asserted that a will may be struck down in part or that the courts may excise one particular provision. By contrast it is urged that while this will has been properly admitted to probate in its entirety, these attorney-draftsmen cannot be permitted to take advantage of the constructive fraud which they practiced on the decedent (cf. Riggs v Palmer, 115 NY 506, 511-512). Thus they should be held to be precluded in consequence of their own conduct, from accepting designation as executors.*
*7 There is nothing in this record to suggest that the appointment of the two Katzes was so integral to the decedent’s dispositive scheme or to the administration of his estate that to deny them the right to serve as executors would frustrate any basic intention of the decedent. There is no linkage between the dispositive plan and the individuals designated as executors. They had no peculiar or detailed knowledge or background with respect to the decedent’s affairs. In no other respect did either bring any special or unique competence to the administration of the decedent’s estate. Neither enjoyed any position of noteworthy confidence or trust. In short, there is nothing to suggest that their removal would be counter to any but a very narrow aspect of the decedent’s manifested intention, or that the administration of the decedent’s estate would in any way suffer in consequence of their unavailability.
On the basis of our examination of the proof in this case and our analysis of the pertinent principles of law, we find no warrant for disturbing the conclusion of the Surrogate that these two attorneys were guilty of having practiced such constructive fraud on the decedent as to preclude their serving as executors of his will.
In reaching the conclusion we do in this instance, we do not wish to be understood as implying that when a testator selects the attorney who draws his will as his executor any presumption or inference of impropriety arises from the circumstance that such attorney is otherwise a stranger. That fact alone does not give rise to any obligation on the part of the attorney to come forward with an explanation. It may well be that the testator sought to assure that his estate would be administered by an outsider free from the competing interference of obsequious members of his family. In any event, it is only where, as here, the evidence warrants an affirmative finding of impropriety and overreaching, predicated on more than the fact of appointment, that courts would be warranted in interfering with the testator’s manifested intention and excluding the attorney as executor.
Accordingly, the order of the Appellate Division should be reversed and the decree of Surrogate’s Court should be reinstated.
*8 Chief Judge Breitel and Judges Jasen, Gabrielli, Wachtler, Fuchsberg and Cooke concur.
Order reversed, with costs, payable by respondents Katz, and the decree of the Surrogate’s Court, Nassau County, reinstated.

 It is generally the case that any rule that a bequest to an attorney-dratsman gives rise to an inference or perhaps a presumption of undue influence does not apply where the attorney is named executor only (see, e.g., Ann., 63 ALR 948). In this instance it might perhaps be argued, however, that the designation of two attorney-partners as coexecutors operates to make them "beneficiaries” to the extent that for what may amount to a single executor’s performance of duty they will become entitled to double commissions. Where the attorney-draftsman is a beneficiary we have said, "The law, recognizing the delicacy of the situation, requires the lawyer who drafts himself a bequest to explain the circumstances and to show in the first *7 instance that the gift was freely and willingly made.” (Matter of Putnam, 257 NY 140, 143.)